**Benjamin ASHMORE, Plaintiff,**

**v.**

**CGI GROUP INC. and CGI Federal Inc, Defendants.**

**No. 11 Civ. 8611(AT).**

United States District Court, S.D. New York.

Signed Sept. 23, 2015.

Robert Lloyd Herbst, Giskan, Solotaroff & Anderson & Stewart, LLP, New York, NY, for Plaintiff.

Andrew Marten Schnitzel, Proskauer Rose LLP, Zachary D. Fasman, Paul Hastings LLP, Louis P. Dilorenzo, Bond, Schoeneck & King, PLLC, New York, NY, Stuart F. Klein, Bond, Schoeneck & King, PLLC, Albany, NY, for Defendants.

## MEMORANDUM AND ORDER

ANALISA TORRES, District Judge:

In this whistleblower action, Plaintiff, Benjamin Ashmore, alleges that Defendants, CGI Group Inc. and CGI Federal Inc. (collectively, "CGI"), violated the anti-retaliation provisions of § 806 of the Sarbanes–Oxley Act of 2002 ("the Sarbanes–Oxley Act"), codified as amended at 18 U.S.C. § 1514A ("Section 806").[1] Plaintiff also brings a breach of contract claim. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND[2]

### I. CGI and the Section 8 Program

In 1974, the Housing Act of 1937 was amended to create the Section 8 Housing

---

1. CGI Federal, Inc. is a subsidiary of CGI Technologies and Solutions Inc., which is in turn a subsidiary of the CGI Group, Inc., Def. Mem. 1 n. 1. Defendants argue, in a footnote without citation, that claims against CGI Group, Inc. should be dismissed because Plaintiff was not employed by CGI Group, Inc. and did not make specific allegations against CGI Group, Inc. *Id.* Putting aside the fact that the issue was not properly raised, *see United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir.1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised ...."), courts have otherwise found this argument unavailing, *see, e.g., Leshinsky v. Telvent GIT, S.A.*, 873 F.Supp.2d 582, 602–05 (S.D.N.Y.2012) (declining to dismiss Sarbanes–Oxley Act claim against parent company brought by employee of a subsidiary).

2. The following facts, which are taken from the parties' Rule 56.1 statements and other

Program ("Section 8 Program"), which authorizes the U.S. Department of Housing and Urban Development ("HUD") to provide federally subsidized housing benefits through rental assistance programs. Pl. 56.1 ¶¶ 1–2, ECF No. 136.[3] HUD utilizes two types of contracts to implement the Section 8 Program: (1) housing assistance program contracts ("HAP contract") and (2) annual contributions contracts ("ACC"). *Id.* ¶ 3. Through a HAP contract, HUD contracts directly with the owner of a privately-owned dwelling ("project owner") to whom HUD pays subsidies. *CMS Contract Mgmt. Servs. v. Massachusetts Hous. Fin. Agency*, 745 F.3d 1379, 1381–82 (Fed. Cir.2014).[4] Alternatively, through an ACC, HUD contracts with a public housing agency ("PHA"), and the PHA then enters into HAP contracts with project owners. Pl. 56.1 ¶¶ 4–5. HUD provides funds to the PHA, and the PHA then uses those funds to pay subsidies to project owners. *Id.*

A restructuring of HUD was announced in 1997, including reforms aimed at transferring HUD's loan and contract administration functions and responsibilities to capable state, local, and other entities. *Id.* ¶ 7; *CMS*, 745 F.3d at 1382. In May 1999, HUD issued a request for proposals ("RFP") seeking bids from contractors, *i.e.* qualified PHAs, which would provide administrative services for most of the project-based Section 8 HAP contracts then being administered by HUD. Pl. 56.1 ¶¶ 9–10. These administrative services are performed pursuant to a performance-based ACC ("PBACC") entered into between HUD and the qualified PHA. *Id.* ¶ 10. A PHA that enters into a PBACC is referred to as performance-based contract administrator ("PBCA"). *Id.* ¶ 11.

CGI provides subcontracting services to PHAs. *Id.* ¶¶ 12–13. CGI agrees to perform tasks necessary for compliance with the Section 8 Program in exchange for a share of revenues. *Id.* ¶¶ 13–14. In 2009, HUD announced a nationwide rebid of all the PBACCs previously awarded through the RFP because the terms of the original contracts had expired and HUD sought to control costs associated with the current PBCA program. *Id.* ¶ 15. Upon announcement of the rebid, Marybeth Carragher, vice president of consulting services and leader of CGI's nationwide PBCA practice, assembled a strategy team tasked with the responsibility of both maintaining CGI's current subcontracting relationships and expanding CGI's presence. *Id.* ¶¶ 16–18; Carragher Decl. ¶¶ 1, 19–20, ECF No. 117. This strategy team, the Rebid Assessment Team, was known within CGI as the "Rat Pack." Pl. 56.1 ¶ 17.

I. *The Rat Pack and the Shell Company Scheme*

In May 2009, CGI hired Plaintiff as a government services delivery manager. *Id.* ¶ 25; Carragher Decl. Ex. 1, at 1, ECF No. 117-1. Before taking this position, Plaintiff worked for HUD, where his duties included overseeing PBCAs. *Id.* ¶¶ 26, 29. When Plaintiff commenced em-

submissions, are undisputed unless otherwise indicated. However, the Court declines to consider facts and arguments first proffered in Defendants' reply memorandum and supporting materials. *See Rowley v. City of New York*, 00 Civ. 1793, 2005 WL 2429514, at *5 (S.D.N.Y. Sept. 30, 2005) ("This Circuit has made clear it disfavors new issues being raised in reply papers.").

3. Although the Court cites the redacted versions of documents filed on ECF in connection with Defendants' motion for summary judgment, unredacted versions of these documents were considered by the Court.

4. Attached as Exhibit 9 to Herbst Declaration. ECF No. 134-9.

ployment, Carragher was Plaintiff's manager and Panos Kyprianou, director of consulting services, was Plaintiff's mentor. *Id.* ¶ 32. Plaintiff's responsibilities included working on PBCA rebid projects, and he was among those who participated in Rat Pack discussions. *Id.* ¶ 33; Ashmore Decl. ¶ 55, ECF No. 135; Herbst Decl. Ex. 2, Rudy Dep. 30:4–18, ECF No. 134–2.

On January 14, 2010, Carragher learned that HUD proposed to limit the number of units on which a PHA or a PHA subcontractor could bid during the rebid process. Pl. 56.1 ¶ 23. The prospective "unit cap" was to be fixed at 300,000 units, a number that fell below CGI's intended expansion objectives.[5] *Id.* ¶ 24. The Rat Pack conducted brainstorming sessions during which members proposed ideas for dealing with the unit cap if it were implemented. *Id.* ¶ 127. Plaintiff alleges that the fraudulent scheme about which he blew the whistle was conceived during these discussions. *Id.* ¶ 108. Specifically, Plaintiff claims that Rat Pack participants discussed a shell company scheme that involved current CGI directors resigning from CGI and setting up independent companies. *Id.* ¶¶ 108, 110, 112, 114. Although ostensibly independent, these entities would have access to CGI's resources and expertise and would enter into agreements with PHAs in lieu of CGI. *Id.* Following the rebid, CGI would acquire these purportedly independent companies and, as a result, their Section 8 contracts. *Id.* In this way, CGI bids would not exceed the unit cap. *Id.*

At his deposition, Plaintiff testified that he first learned of the shell company scheme over drinks at a hotel in Fairfax, Virginia. Klein Decl. Ex. 11, Ashmore Dep. 334:18–335:2, ECF Nos. 116–14, 116–15. Plaintiff stated that Les Pierce, a member of the Rat Pack, initially raised the shell company idea, and although Plaintiff testified that he did "not think[ ] there was much seriousness to it," he stated that he voiced objections to the scheme's efficacy. *Id.* at 339:13–15, 340:3–341:5. Plaintiff testified that the idea was next raised during a regular Rat Pack strategy call that took place after the Virginia meeting. *Id.* at 348:3–14, 349:13–20. Plaintiff stated that the reintroduction of the issue made him realize that the shell company idea was more than "just back-of-the-envelope ideas being tossed at a table" and that he voiced his position that the scheme was illegal. *Id.* at 352:9–354:8. Plaintiff stated that following this discussion, the topic "dropped off the radar" and that the Rat Pack was in a "holding pattern." *Id.* at 355:11–14. He further testified that at this time "[t]here were no concrete steps ... no action items, ... nothing planned beyond a discussion about is this a way to do it" and that he was not aware of particular steps being taken to implement the scheme. *Id.* at 357:6–358:2.

Plaintiff stated that this changed on May 11, 2010, when the scheme moved beyond a "broad idea" and crystallized into "an actual breakdown ... of which states would go with which directors."[6] *Id.* at 359:3–16. Plaintiff testified that he came to this realization because a document outlining the scheme, though not explicitly

---

**5.** In anticipation of the rebid, CGI had entered into memoranda of understanding with prospective PHAs with whom CGI would form subcontracting relationships. Pl. 56.1 ¶¶ 18, 21; Ashmore Decl. ¶ 52.

**6.** This event followed the transmission of a series of e-mails dated April 16, 2010, one of which is from Carragher to various recipients including Kyprianou and Dennis Ryan, another Rat Pack member, indicating that she "believe[d] HUD has decided the unit cap will stand." Herbst Decl. Ex. 49, ECF No. 134–49; *see* Herbst Decl. Ex. 4, Ryan Dep. 33:16–17, 34:10–35:16, 48:3–51:17, ECF No. 134–4 (discussing e-mails).

referencing it, was circulated to the Rat Pack and Carragher expanded on the information contained in that document and the dimensions of the scheme during a strategy phone call on May 11th. *Id.* at 358:3–359:16, 365:9–367:23, 368:12–24. Plaintiff stated that after the call he contacted Carragher and mounted a firm objection to the scheme, telling Carragher that it was "illegal and fraudulent." *Id.* at 359:17–22, 368:12–21. A little more than a month later, Plaintiff was excluded from the Rat Pack. Herbst Decl. Ex. 38, at 3, ECF No. 134–38 (e-mail dated June 14, 2010 from Carragher to Joyce Clause stating that "[w]e need to make sure no R[at] Pack files get sent to [Plaintiff] for tomorrow's call"). Plaintiff was fired on June 16, 2010. Pl. 56.1 ¶ 82.

CGI contends that the shell company scheme did not exist and was not discussed during Rat Pack meetings. Pl. 56.1 ¶¶ 109, 111, 113, 115–16. Several current and former employees of CGI testified that the scheme was, at most, an idea that was raised in jest during a Rat Pack conference call and promptly dismissed as unfeasible. *Id.* ¶¶ 134–37; Klein Decl. Ex. 13, Carragher Dep. 128:21–130:24, ECF Nos. 116–19, 116–20, 116–21; Klein Decl. Ex. 12, Kyprianou Dep. 220:8–221:23, ECF Nos. 116–16, 116–17, 116–18; Herbst Decl. Ex. 1, Gorris Dep. 51:5–19, ECF No. 134–

1; Rudy Dep. 48:2–13. However, the testimony of at least two of these individuals indicates that the idea of CGI forming separate entities or independent CGI subsidiaries was discussed in more serious terms. Kyprianou Dep. 217:11–220:4; Gorris Dep. 45:16–48:12, 49:10–50:4, 51:20–54:20.[7]

In addition to the shell company scheme, CGI considered alternate methods for dealing with the unit cap, including the "49/51 strategy." Pl. 56.1 ¶¶ 111, 147. The 49/51 strategy is premised on the idea that a subcontractor may exclude particular units from its unit cap count so long as the PHA and subcontractor certify in the rebid proposal that the subcontractor will perform less than 50% of the work under the contract. Pl. 56.1 ¶¶ 111, 145; Herbst Decl. Exs. 44, 45, ECF Nos. 134–44, 134–45; Ashmore Dep. 322:7–19. Plaintiff testified that the 49/51 strategy was a "separate and distinct avenue[ ]" for dealing with the unit cap and that he "did not [inform CGI] in such a clear way that the 49/51 scheme was illegal." Ashmore Dep. 321:4–18. Plaintiff, however, testified that he did "object[ ] to pursuing that avenue without [first obtaining] clarification from HUD." *Id.* at 318:14–21.[8]

Plaintiff alleges that following his exclusion from Rat Pack discussions the fraudu-

---

7. Kyprianou's testimony referenced an e-mail dated January 29, 2010 that was written by him and addressed to Carragher among others not including Plaintiff. Pl. 56.1 ¶¶ 128–29; Kyprianou Decl. Ex. 19, ECF No. 118–19. The e-mail discussed possible methods of avoiding the "unit restriction," including: (1) CGI "hid[ing] behind" a PHA's instrumentality entity by subcontracting from the PHA's instrumentality entity rather than the PHA directly; and (2) the creation of "new entities [for] selected jurisdictions that are a join[t] venture of PHA and CGI subsidiary" that would not run afoul of the unit restriction because they are "somehow independent from CGI." Kyprianou Decl. Ex. 19, at 1–2. In reference to this e-mail, Carragher testified that although legal counsel suggested that CGI may be able to set up subsidiaries that would each be able to subject to separate unit caps, the idea was "quickly dismissed" because "CGI would never approve of that." Carragher Dep. 132:7–133:19.

8. In guidelines issued during the 2011 invitation for proposals, HUD did clarify that if a subcontractor certifies that it will provide less than 50% of the full time equivalent employees required to perform certain tasks under the PBACC, units subject to that agreement would not be counted toward a subcontractor's unit cap. Pl. 56.1 ¶ 145.

lent transfer-back element of the shell company scheme was incorporated into the "49/51" strategy.[9] Pl. 56.1 ¶ 111. Rather than forming separate corporate entities that would later be acquired, CGI would instead form 49/51 relationships with particular PHAs with an understanding that the PHAs would transfer back work to CGI following the rebid. *Id.* The testimony of several Rat Pack members indicates that they considered the 49/51 concept with a subsequent transfer of responsibilities back to CGI. Rudy Dep. 68:12–70:14; 74:2–24; Gorris Dep. 110:5–113:25; Ryan Dep. 68:9–73:14. CGI ultimately did engage several PHAs in 49/51 relationships in bids to HUD during the 2011 invitation for proposals, which was subsequently cancelled.[10] Pl. 56.1 ¶¶ 147, 154.

## II. *Plaintiff's Job Performance and Termination*

In early April 2010, Plaintiff was reassigned to Kyprianou's supervision. Pl. 56.1 ¶ 34. At their depositions, Carragher and Kyprianou testified that the transition was implemented so that Plaintiff could be placed on billable projects that would better utilize his time. Carragher Dep. 195:14–196:4; Kyprianou Dep. 56:13–58:9, 63:11–17. Shortly after this transition, Carragher gave Plaintiff his 2010 written performance review, which rated Plaintiff as "meets expectations"—the middle of five evaluation levels—in all performance categories. Pl. 56.1 ¶ 38; Carragher Decl. Ex. 3, ECF No. 117-3. The evaluation provided positive assessments of Plaintiff's initiative, independence, and dependability but criticized Plaintiff's communication, time-management, and focus. Pl. 56.1 ¶¶ 37–38; Carragher Decl. Ex. 3.

At the time Plaintiff was transferred to Kyprianou's supervision, Plaintiff was serving as project manager on an Oakland Housing Authority ("OHA") project. Pl. 56.1 ¶ 51. Plaintiff assigned himself five recertifications. *Id.* ¶¶ 52, 54. An employee working on the OHA project inquired with Plaintiff about the status of the recertifications, noting that twelve days had passed since Plaintiff had assigned himself the task. *Id.* ¶ 57. In response, Plaintiff reassigned the recertifications to the inquiring employee, indicating that he was "swamped" on a different matter. *Id.* ¶¶ 57–58. In a May 18, 2010 e-mail, Kyprianou criticized Plaintiff for reassigning his OHA recertifications and for not providing slides for a separate project. *Id.* ¶ 63. Kyprianou also expressed general dissatisfaction with Plaintiff's failure to provide regular updates on his activities and referenced a May 5, 2010 e-mail, in which Kyprianou specifically re-

---

9. The complaint does not reference the 49/51 strategy, Pl. 56.1 ¶¶ 148, 150, and Plaintiff has no direct knowledge that the transfer-back element of the shell scheme was incorporated into GCI's 49/51 strategy. Plaintiff contends discussions and fired. *Id.* ¶ 111. Plaintiff, however, does point to documents that he claims show a blending of the shell company scheme and the 49/51 strategy. *See* Herbst Decl. Ex. 50, at 4, ECF No. 134-50 (presentation slide attached to an e-mail dated May 17, 2010 that states "[w]illing to transfer 51% to GCI after [after] years"); Herbst Decl. Ex. 53, at 7, ECF No. 134-53 (presentation slide dated July 12, 2010 noting under section for "GCI Role" that CGI would be "[p]rime for PHA [p]artnership ( [s]ub during HUD recompetes)").

10. There is no evidence in the record indicating that CGI did, in fact, have understandings with any PHA to have work transferred back at a later time. Plaintiff attempts to demonstrate that such understandings existed by referencing draft budgeting documents that he contends show that staffing remained constant even though CGI had purported to shift to a 49/51 relationship with those PHAs. *See* Pl. 56.1 ¶ 111. The Court, however, finds the conclusions to be drawn from these submissions to be speculative.

quested that Plaintiff submit daily e-mail updates. *Id.; Kyprianou Decl.* Exs. 10, 11, ECF Nos. 118–10, 118–11. In a May 18, 2010 e-mail Kyprianou stated that he wanted to set up a call with Plaintiff to "come up with a corrective action plan." Kyprianou Decl. Ex. 11, at 1. Kyprianou testified that he and Plaintiff discussed Plaintiff's performance but that Kyprianou did not issue a corrective action plan. Kyprianou Dep. 99:22–103:12. Kyprianou further stated that prior to this occasion he could not recall a specific instance when he criticized Plaintiff's performance. Kyprianou Dep. 99:2–21. In a May 28, 2010 e-mail, Kyprianou reminded Plaintiff to submit daily summary reports, criticized him for failing to keep his colleagues informed, and noted Plaintiff's lack of "outcomes" with respect to certain assignments. Kyprianou Decl. Ex. 13, at 1, ECF No. 118–13. In response, Plaintiff sent several e-mails recapping the work he had performed. Kyprianou Decl. Ex. 12, ECF No. 118–12.

During his short tenure as Plaintiff's supervisor, Kyprianou criticized other aspects of Plaintiff's performance. For instance, on several occasions Plaintiff requested last-minute changes in his work schedule. Pl. 56.1 ¶¶ 43–47, 49. Although CGI does not have a formal attendance policy for managerial employees, Klein Decl. Ex. 4, at 2, ECF No. 116–4, Kyprianou told Plaintiff in an April 8, 2010 e-mail that "advance notice, except for emergencies, is required for time off or working from home requests," Pl. 56.1 ¶ 45. This issue resurfaced in June, when Plaintiff asked Kyprianou for additional time off. *Id.* ¶ 77. In a June 7, 2010 e-mail, Kyprianou asked Plaintiff to submit a request specifying dates and times. *Id.; Kypria-*

nou Decl. Ex. 16, at 3, ECF No. 118–16. Finding Plaintiff's response inadequate, Kyprianou, in a June 8, 2010, e-mail again asked Plaintiff to specify particular days and blocks of time. Pl. 56.1 ¶ 79; Kyprianou Decl. Ex. 16, at 2. Plaintiff responded that he found the situation "frustrating" and that he felt Kyprianou was "babysitting [him]." Pl. 56.1 ¶ 81.

In addition, Kyprianou criticized Plaintiff's management of the HUD transformation initiative project. Because of apparent miscommunication between Plaintiff and the prime contractor on the project, the contractor contacted several CGI employees whom Plaintiff had failed to notify that they were involved in the project. *Id.* ¶¶ 69–72; Kyprianou Decl. Ex. 14, ECF No. 118–14 (e-mails related to project). While Plaintiff was absent from work dealing with a personal issue, Kyprianou informed Plaintiff he was "taking the lead" on the project. Pl. 56.1 ¶ 73. Kyprianou sent an e-mail to Plaintiff on June 4, 2010, complaining that Plaintiff failed to follow his instructions regarding the shift in leadership. Kyprianou Decl. Ex. 15, at 2. Plaintiff responded, expressing his displeasure with Kyprianou's "accusatory e-mails" and stating that he believed Kyprianou was "outright wrong" in his criticisms. Kyprianou Decl. Ex. 15, at 1–2, ECF No. 118–15. In response, Kyprianou noted that he was "not happy with [Plaintiff's] performance." Pl. 56.1 ¶ 76.

On June 14, 2010, Kyprianou e-mailed CGI's human resources department recommending that Plaintiff be discharged. Pl. 56.1 ¶ 82; Kyprianou Decl. Ex. 17, ECF No 118–17. On June 16, 2010, after Carragher conferred with Richard Schmitz, her supervisor, Kyprianou fired Plaintiff.[11] Pl. 56.1 ¶¶ 83, 85–87. The

---

11. Plaintiff contends that the reasons proffered for his termination are pretextual. Plaintiff points to an e-mail dated June 8 and

notes related to a conference call held the following day that show changes to HUD's revised annual contributions contract, includ-

same day, Plaintiff spoke by phone with Kyprianou, a representative from human resources, and Ryan. *Id.* ¶ 89. Plaintiff did not mention the shell company scheme during the conversation but questioned Kyprianou's assessment of his performance. *Id.* ¶¶ 90–92. Plaintiff then sent an e-mail to several executives at CGI, claiming that his termination was "wrongful" and "ha[d] nothing to do with [his] performance." *Id.* ¶¶ 93–94; Carragher Decl. Ex. 13, at 2, ECF No. 117–13. Plaintiff did not mention the shell company scheme in this e-mail. *Id.* ¶ 94. The following day, Plaintiff recorded a phone call with Carragher and a human resources representative. *Id.* ¶¶ 95–96, 99. During the conversation, Plaintiff did not mention the shell company scheme but objected to what he believed was a lack of documentation supporting his termination. *Id.* ¶¶ 97–98.

### IV. *Plaintiff's Compensation Terms*

Plaintiff's offer letter sets his base salary at $126,000 and states that he is eligible to participate in GGI's profit participation program. Pl. 56.1 ¶ 159; Carragher Decl. Ex. 1. Plaintiff testified that his supervisors "would have discretion to award [him] a bonus based upon ... performance," but he noted that he believed it was discretionary "insofar as ... he met his performance metrics." Pl. 56.1 ¶ 160. Plaintiff did not receive documents indicating that bonus compensation was mandatory or that all employees would receive an annual bonus. *Id.* ¶ 161. CGI's fiscal year runs from October 1 to September 30. *Id.* ¶ 156.

### DISCUSSION

### I. *Standard of Review*

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Feingold v. New York,* 366 F.3d 138, 148 (2d Cir.2004). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those that, under governing law, may affect the outcome of a case. *Id.*

The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing to particulars in the record. Fed. R.Civ.P. 56(a), (c); *Celotex,* 477 U.S. at 322–25, 106 S.Ct. 2548; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). The movant may satisfy its burden by "showing that the materials cited do not establish the ... presence of a genuine dispute." Fed.R.Civ.P. 56(c)(1)(B). If the non-moving party has the burden of proof on specific issues, the movant may also satisfy its own initial burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *PepsiCo Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002). In deciding the motion, the court views the record in the light most favorable to the

---

ing imposition of the unit cap. Herbst Decl. Exs. 35–36, ECF Nos. 134–35, 134–36. Following this announcement, Carragher cancelled the Rat Pack meeting scheduled for June 11, 2010, and on June 14, sent an e-mail stating that Rat Pack files should no longer be directed to Plaintiff and that "[Plaintiff] needs

to be removed from the invite." Herbst Decl. Ex. 38, at 1–3. Plaintiff contends he was fired because of Carragher's now greater certainty that the unit cap would be imposed and his earlier objection to CGI's fraudulent intentions. Pl. 56.1 ¶ 82.

nonmoving party. *O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 61 (2d Cir.2002).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of fact. *Beard v. Banks*, 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir.2001). The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by facts. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir.2002). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation marks omitted).

## II. *Sarbanes–Oxley Section 806*

In relevant part, Section 806 of the Sarbanes–Oxley Act provides that a publicly traded company, including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, may not:

> discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee ... to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to ... a person with supervisory authority over the employee (or such other person

working for the employer who has the authority to investigate, discover, or terminate misconduct). . . .

18 U.S.C. § 1514A(a)(1)(C).

■■■■ Courts employ a burden-shifting framework to assess retaliation claims under Section 806. *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir.2013). First, the employee bears the initial burden of making a *prima facie* showing of retaliatory discrimination. *Id.* To make a *prima facie* showing, "an employee must prove by a preponderance of the evidence that (1) he or she engaged in protected activity; (2) the employer knew that he or she engaged in the protected activity; (3) he or she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Id.* at 451. If the employee makes a sufficient *prima facie* showing, the burden then shifts to the employer, who in order to prevail must "prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.* at 447 (internal quotation marks and citation omitted).

■■■■ "At the summary judgment stage, a plaintiff need only demonstrate that a rational factfinder could determine that Plaintiff has made his *prima facie* case. Assuming a plaintiff does so, summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record *clearly and convincingly* demonstrates that the adverse action would have been taken in the absence of the protected behavior." *Leshinsky v. Telvent GIT, S.A.*, 942 F.Supp.2d 432, 441 (S.D.N.Y.2013). Accordingly, an employer's burden under Section 806 is notably greater than the burden imposed by other federal employee protection statutes, "making summary judgment against plain-

tiffs in Sarbanes–Oxley retaliation cases a more difficult proposition." *Id.*

## A. Prima Facie Case

Defendants contend that Plaintiff cannot establish a *prima facie* showing of retaliation because he cannot demonstrate that: (1) he engaged in a protected activity; or (2) Defendants had knowledge he engaged in a protected activity. Def. Mem. 36–47.[12]

### 1. Protected Activity [13]

■■■ An employee's activity is "protected" under the Sarbanes–Oxley Act when he provides information " 'regarding . . . conduct which [he] reasonably believes constitutes a violation' of the enumerated federal provisions." *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (quoting 18 U.S.C. § 1514A(a)(1)). "A reasonable belief contains both subjective and objective components" and, therefore, "a plaintiff 'must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.' " *Id.* (citation omitted). "The objective prong of the reasonable belief test focuses on the 'basis of knowledge available to a reasonable per-

son in the circumstances with the employee's training and experience.' " *Id.* (citation omitted). As the inquiry focuses on the reasonableness of the employee's belief, the conduct about which the employee provides information need not have actually violated an enumerated provision. *Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir.2008) ("[A] whistleblower need not show that the corporate defendant committed fraud to prevail in her retaliation claim under [Section 806].").

■■■ As an initial matter, the Court rejects Defendants' argument that Plaintiff did not engage in a protected activity because he: (1) does not offer documentary evidence corroborating the existence of the shell company scheme or his objections to it; (2) failed to raise the scheme in post-termination communications with CGI; and (3) objected to conduct that he claimed was in violation of HUD and federal procurement requirements, not the provisions enumerated under Section 806. Def. Mem. 36–38.

■■■ Defendants' argument regarding the existence of the shell company scheme is a red herring. In their briefing, Defen-

---

**12.** As Defendants' motion papers address neither the causation prong nor the unfavorable personnel action prong of the *prima facie* standard, *see* Def. Mem. 34–47, the Court concludes that Defendants have conceded these issues.

**13.** As an initial matter, the Court does not find that objections Plaintiff allegedly made prior to his May 11 objection qualify as protected activity. First, Plaintiff testified that when he raised concerns about the shell company scheme when it was first discussed at a Virginia hotel he didn't take the idea seriously and only expressed that he didn't think the idea would work. Ashmore Dep. 340:14–341:5. Although Plaintiff testified that when the subject was raised again he stated that it was illegal, he further stated that he did not believe any steps were being taken in furtherance of the scheme. *Id.* at 352:18–23,

355:11–358:2. Accordingly, the Court does not find that Plaintiff "had both a subjective belief and an objectively reasonable belief that the conduct he complained of constituted a violation of relevant law." *Leshinsky*, 942 F.Supp.2d at 444 (quoting *Welch v. Chao*, 536 F.3d 269, 275 (4th Cir.2008) (internal quotation marks omitted)). In addition, given the lapse in time between these objections and Plaintiff's termination and the absence of evidence of other intervening retaliatory actions, the Court does not find that there is a sufficient causal connection between these objections and Plaintiff's termination. *See id.* at 450 ("[I]n this circuit, 'claims of retaliation are routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation.' " (citation and brackets omitted)).

dants contend that the scheme was "conjured up" by Plaintiff and is a "complete and utter fabrication" unsupported by documentary evidence. In essence, Defendants argue that because Plaintiff cannot prove that a fraudulent scheme existed, he cannot show that he engaged in protected activity within the meaning of the whistleblower statute. As the Second Circuit has noted, the Sarbanes–Oxley whistleblower provision "focus[es] on the plaintiff's state of mind rather than on the defendant's conduct." *Guyden*, 544 F.3d at 384. For this reason, "a whistleblower need not show that the corporate defendant committed fraud to prevail in [a] retaliation claim under § 1514A." *Id.* Rather, "the statute only requires the employee to prove that she 'reasonably believe[d]' that the defendant's conduct violated federal law." *Id.* In this action, therefore, Plaintiff need not prove that a fraudulent scheme existed. Rather, he must show that he held a reasonable belief that Defendants were engaged in conduct that violated one of the enumerated federal laws.

To the extent that Defendants seek to disprove the existence of the shell company scheme in order to challenge the reasonableness of Plaintiff's belief, that turns on factual questions that cannot be resolved at this stage. "Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment, as long as the plaintiff's 'testimony was not contradictory or rife with inconsistencies such that it was facially implausible.'" *Perez v. Progenics Pharm., Inc.*, 965 F.Supp.2d 353, 362 (S.D.N.Y.

2013) (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir.2010)). Although Defendants cite the deposition testimony and declarations of current and former CGI employees to support the argument that Plaintiff's story is fabricated and that the shell company scheme was simply an idea raised in jest, Plaintiff's version of events has not been adequately refuted.[14] Although a jury may decline to credit Plaintiff's testimony, the competing evidence here simply creates a " 'he said, she said' on which the court cannot, in the context of this case, take a side at the summary judgment stage." *Fincher*, 604 F.3d at 726 (citation omitted).

Likewise, Defendants provide no support for the argument that a whistleblower's failure to reference earlier objections to fraudulent conduct during termination discussions conclusively undermines an allegation that such objections took place. Indeed, there are a host of reasons a person seeking to retain his job would decline to mention the alleged fraud to which he had objected, and it would be speculative for the Court to conclude that Plaintiff's failure to do so proves that no protected activity occurred.[15] *See, e.g., Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 437 & n. 7 (E.D.N.Y.2009) (finding, in the Title VII context, that plaintiff's informal complaints about harassment to supervisors constituted protected activity and rejecting defendants' argument that complaints were not protected because plaintiff had

**14.** In addition, Plaintiff has put forth some evidence beyond his testimony indicating that the CGI considered a strategy involving separate entities participating in the rebid. *See* Kyprianou Decl. Ex. 19; Kyprianou Dep. 217:11–220:4; Gorris Dep. 45:16–48:2, 49:10–50:4, 51:20–54:20. However, Plaintiff has not submitted the allegedly incriminating document discussed during the May 11th Rat

Pack call, even though he testified to having encountered it in Defendants' document production. *See* Ashmore Dep. 367:5–13.

**15.** Furthermore, Section 806 only requires that an employee provide information to a "person with supervisory authority over the employee." 18 U.S.C. § 1514A(a)(1)(C).

not also directed those complaints to the employer's human resources department).

Finally, as to Defendant's argument that Plaintiff objected only to violations of HUD and federal procurement requirements, " 'the critical focus is ... whether the employee reported conduct that he or she *reasonably believes* constituted a violation of federal law,' and 'not whether that information definitively and specifically described one or more of those violations.' " *Leshinsky,* 942 F.Supp.2d at 443 (citation omitted); *accord Nielsen,* 762 F.3d at 221 (rejecting "definitively and specifically" standard). Thus, "[a] complainant fulfills his duty ... when he 'identifies conduct that falls within the ample bounds of the anti-fraud laws.' " *Leshinsky,* 942 F.Supp.2d at 443 (quoting *Wiest v. Lynch,* 710 F.3d 121, 132 (3d Cir.2013) (ellipsis and brackets omitted)). Plaintiff alleges that he told Carragher that the shell company scheme was an illegal and fraudulent way to evade HUD and federal procurement regulations and that the scheme was devised and discussed through e-mail and phone conversations.[16] In light of Plaintiff's training and experience, which included working for HUD—but no expertise in mail and wire fraud law—the Court cannot conclude that it was unreasonable, as a matter of law, for Plaintiff to believe that

the alleged scheme implicated the mail and wire fraud statutes. *See Perez,* 965 F.Supp.2d at 365–66 (concluding there was a genuine issue of material fact as to the objective reasonableness of a belief held by a whistleblower that an employer's misleading press release constituted a securities fraud violation).

These issues aside, the Court now turns to whether Plaintiff had an objectively reasonable belief that the conduct about which he complained constituted a violation of the provisions enumerated under Section 806.

### a. Objective Reasonableness

 ▪ "The question whether a plaintiff's belief was objectively reasonable is a 'mixed question of law and fact,' meaning that it should be decided by the Court only if there is no genuine issue of material fact as to the belief's reasonableness." *Leshinsky,* 942 F.Supp.2d at 444 (quoting *Welch,* 536 F.3d at 278). Defendants argue that Plaintiff's belief was objectively unreasonable because the scheme was predicated on too many contingencies and improbable elements for one to reasonably believe it could be executed.[17]

Although the scheme's success does hinge on a number of uncertain elements,[18]

---

16. Plaintiff alleges in his complaint that the scheme constituted mail fraud and wire fraud. Compl. ¶ 69, ECF No. 1. However, in his memorandum, Plaintiff puts forth a new theory based on a reasonable belief the scheme violated securities law. *See* Pl. Mem. 50, ECF No. 137. The Court declines to entertain this theory. *See Brown v. Magistro,* 10 Civ. 3705, 2011 WL 6399514, at *3 (S.D.N.Y. Dec. 20, 2011) (collecting cases) ("[I]t is well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint.").

17. Defendants also argue that Plaintiff's beliefs lack objective reasonableness because Plaintiff has not proven the parties's compet-

ing testimony, there is a genuine issue of material fact concerning the scheme's existence. *See supra* Section II.A.1.

18. Specifically, Defendants note that in order for the scheme to work the following would have to occur: "(1) ... Carragher would have to get three levels of management above her to approve it ...; (2) the directors [of] CGI's entire PBCA operations ... would simultaneously need to resign at the same time to create these shell companies, without raising [HUD's suspicion]; (3) these directors would then have to be willing to end successful long-standing careers and risk the loss of their reputation[s] ...; (4) these directors would then have to be able to convince a number of PHAs across the country to agree ..., not-

these contingencies are not so improbable that a reasonable person of like experience would never, as a matter of law, conclude that the plan could be executed. Rather, one could reasonably believe the scheme was conceivable following a meeting directed by a supervisor at which the plan was discussed and defined in some detail. *See, e.g., Leshinsky,* 942 F.Supp.2d at 445–46 (concluding that plaintiff had an objectively reasonable belief that alleged fraud could come to fruition even though fraud would likely be thwarted by government procurement requirements because plaintiff had only limited experience with technical procurement rules and the scheme was discussed at length in a meeting conducted by people more familiar with the process).

Furthermore, Plaintiff could reasonably believe that "mail fraud or wire fraud was taking place, or was on the verge of taking place," despite the contingencies attendant to the underlying scheme. *Id.* at 447. Because the Rat Pack was allegedly considering and planning a scheme to defraud HUD by phone and e-mail, a person of like experience and training as Plaintiff could conclude that mail or wire fraud was under way. *Id.* at 447 & n. 6 (indicating that it was reasonable for a plaintiff to believe that mail and wire fraud was "taking shape" or "in progress" based on substantive discussion of alleged scheme furthered through use of mail, telephone, and e-mail).

Therefore, construing the evidence in the light most favorable to Plaintiff, the

Court concludes there is a genuine issue of material fact as to the objective reasonableness of Plaintiff's belief.

#### b. Subjective Belief

■ In addition to having an objectively reasonable belief, Plaintiff must also subjectively believe that the conduct about which he objected was in violation of a provision enumerated under Section 806, for "it would make no sense to allow a plaintiff to proceed if he himself did not hold the belief required by the statute." *Id.* at 447 (quoting *Livingston v. Wyeth, Inc.,* 520 F.3d 344, 352 (4th Cir.2008) (internal quotation marks and brackets omitted)). Indeed, "the law is not meant to protect those whose complaints are not undertaken in subjective good faith." *Day v. Staples, Inc.,* 555 F.3d 42, 54 (1st Cir. 2009). Defendants contend that Plaintiff lacked subjective belief because: (1) he failed to document his objections to the scheme or communicate them to someone outside the Rat Pack; and (2) his deposition testimony indicates that he did not believe that scheme was occurring at the time he raised his objections.[19] Def. Mem. 44–47.

Plaintiff admits that he did not document evidence of the scheme or his objections and that he did not raise concerns about the scheme to anyone outside of the Rat Pack. Pl. 56.1 ¶¶ 119–21, 126. Although courts have found that similar actions suggest a lack of subjective belief, *see Leshinsky,* 942 F.Supp.2d at 447 (noting that plaintiff's decision to report allegedly

---

withstanding the fact that they already had entered into contracts with CGI; (5) CGI would also agree to provide its proprietary industry software ... to these shell companies; and (6) all of the aforementioned events ... would need to occur on the 'hope' that the sham bids submitted by the shell company[ies] and [their] PHA partner[s] would be awarded by HUD." Def. Mem. 43–44.

19. Defendants also argue that Plaintiff lacked a subjective belief because he only believed the conduct about which he allegedly objected was violation of HUD and federal procurement requirements, not a provision under Section 806. Def. Mem. 46–47. However, this argument has already been rejected. *See supra* Section II.A.

fraudulent conduct to only a single supervisor was evidence suggesting lack of subjective belief), Plaintiff testified that he took this approach because: (1) he respected his colleagues; (2) Carragher assured him that they were simply covering their bases; and (3) he was fairly confident CGI's lobbying efforts would be successful, which would obviate the need to implement the scheme. Pl. 56.1 ¶ 121. These are plausible explanations for Plaintiff's failure to memorialize his concerns in writing or convey information to a third party.

Although Plaintiff's testimony indicates that he believed the scheme might ultimately not be executed,[20] he need only believe that the violation is likely to happen. *Id.* at 446 (noting that Section 806 covers "a violation that has not occurred" as long as the employee believes that the violation "is likely to happen" (quoting *Wiest*, 710 F.3d at 132 (internal quotation marks omitted))). There is sufficient evidence from which a jury could reasonably conclude that Plaintiff held a subjective belief that a mail or wire fraud violation was likely to happen.

Accordingly, construing the evidence in the light most favorable to Plaintiff, the Court concludes there is a genuine issue of material fact as to whether Plaintiff held a subjective belief that Defendants' conduct amounted to mail or wire fraud.

**2. Knowledge of the Protected Activity**

██ Next, Defendants argue that CGI did not know Plaintiff engaged in a protected activity because Plaintiff's statements to Carragher would only place CGI on notice that Plaintiff believed the scheme violated HUD and federal procurement regulations, not a provision enumerated under Section 806. Def. Mem. 40–41. This argument simply recasts Defendants'

earlier contention that Plaintiff failed to engage in protected activity because his communication was insufficiently specific. Plaintiff's communication need not have the degree of specificity demanded by Defendants. Rather, if the communication conveys information about conduct that Plaintiff reasonably believes is a violation of an enumerated provision, it is sufficient for protection under the Section 806. *See Welch*, 536 F.3d at 276 (noting that a whistleblower "need not 'cite a code section he believes was violated' in his communication to his employer, but [that] the ... communication[ ] must identify the specific conduct that the employee believes to be illegal" (quoting *Fraser v. Fiduciary Trust Co. Int'l*, 417 F.Supp.2d 310, 322 (S.D.N.Y.2006))). Plaintiff's communication to Carragher of a reasonable belief that Defendants were planning a scheme to deceive HUD was sufficient to provide Defendants with notice of Plaintiff's protected activity. *See, e.g., Barker v. UBS AG*, 888 F.Supp.2d 291, 299 (D.Conn.2012) (concluding that that evidence of an employee's communications with her supervisors and the employer's head of compliance that raised concerns about conduct she reasonably believed was in violation of Section 806 was sufficient to alert an employer of her protected activity).

**3. Conclusion**

For the foregoing reasons, the Court concludes there are genuine issues of material fact as to whether Plaintiff engaged in protected activity under the Sarbanes–Oxley Act and whether Defendants knew of his protected activity.

**B. Non–Retaliatory Rationale**

Even if Plaintiff establishes a *prima facie* case of retaliation, Defendants are enti-

---

**20.** Indeed, Plaintiff testified that at the time he objected "th[e] scheme was a potential

eventuality if the unit caps became firm," but not a certainty. Ashmore Dep. 379:5–11.

tled to summary judgment if they show "there is no genuine dispute that the record *clearly and convincingly* demonstrates that [their] adverse action would have been taken in the absence of the protected behavior." *Leshinsky,* 942 F.Supp.2d at 441. Defendants, relying on Plaintiff's April performance review, testimony from Kyprianou and Carragher, and communications evidencing dissatisfaction with Plaintiff's work performance, argue that the record clearly and convincingly establishes that Plaintiff was terminated for performance issues unrelated to his protected activity. Def. Mem. 47–48.

 There is ample evidence in the record suggesting that reasons unrelated to Plaintiff's alleged objection to the shell company scheme contributed to Defendants' decision to terminate Plaintiff. Although Plaintiff characterizes his April performance review as "positive," Pl. Mem. 54, Carragher gave Plaintiff an average rating in every performance category and criticized Plaintiff's communication with supervisors and colleagues, project management, and time management. An employee's assessment of his own performance is generally not entitled much deference, especially if there is no evidence independently demonstrating that Plaintiff's work was of similar quality to those receiving higher ratings. *See, e.g., Hu v. UGL Servs. Unicco Operations Co.,* 13 Civ. 4251, 2014 WL 5042150, at *6 (S.D.N.Y. Oct. 9, 2014) (noting, in the Title VII context, that "[one's] own view of his work performance, without more, is insufficient to demonstrate pretext"). Indeed, several of the problems mentioned in the April performance review were among those raised by Kyprianou after Plaintiff came under his supervision. Even before Plaintiff's May 11 objection, Kyprianou directed Plaintiff to start providing timely notice before requesting changes in his work schedule. Despite Kyprianou's request, Plaintiff failed on successive occasions to inform Kyprianou of absences. In addition, prior to Plaintiff's May 11th objection, Kyprianou requested that Plaintiff send daily e-mails detailing his activities. Indeed, both Kyrianou and Carragher expressed frustration with Plaintiff's failure to inform them of his activities, and notwithstanding Kyprianou's May 5, 2010 e-mail demanding routine updates, Plaintiff failed to give Kyprianou summaries until prompted to do so in a later e-mail. Several of Kyprianou's requests were met with defiant responses from Plaintiff, some of which were inherently inappropriate for communications from a subordinate to a supervisor. *See* Kyprianou Decl. Exs. 15, 16. Finally, Plaintiff's management of the OHA project and miscommunication in relation to the HUD transformation initiative project constitute additional evidence of Plaintiff's performance deficiencies.

Notwithstanding Defendants' showing, Plaintiff argues that Defendants' rationale is pretextual. Pl. Mem. 54–55. Plaintiff notes the close temporal proximity between his protected activity and termination, which occurred less than two months after his May 11 objection. In addition, Plaintiff contends that his April performance review was positive and contradicts evidence of poor performance. Plaintiff also points to Kyprianou's decision to not issue a corrective action plan or to provide disciplinary guidance beyond a single phone call prior to seeking Plaintiff's discharge. Finally, Plaintiff argues that his exclusion from Rat Pack discussions shortly before his termination constitutes evidence of a retaliatory motive.[21]

---

21. Plaintiff, however, was not excluded from Rat Pack discussions until June, more than a month following his objection. Pl. 56.1 ¶ 82. Indeed, this fact tends to support Defendants'

Although it is clear that Plaintiff's performance was wanting, it is not clear that these insufficiencies alone warranted Plaintiff's discharge. Though average on whole, Carragher's evaluation of Plaintiff was complimentary in certain areas. *See, e.g., Barker,* 888 F.Supp.2d at 301–02 (D.Conn.2012) (denying summary judgment on Section 806 claim despite evidence of Plaintiff's "performance and interpersonal issues" because, *inter alia,* performance reviews had positive elements). In addition, Plaintiff was fired only a little more than a month following his protected activity, and there is evidence that other CGI employees were given formal corrective action plans prior to termination, Pl. 56.1 ¶ 82, raising factual issues regarding the propriety of the termination practices utilized in Plaintiff's case. *See, e.g., Perez,* 965 F.Supp.2d at 369 (explaining that close proximity of protected activity and adverse action supported finding of causation and undermined showing that adverse action was occasioned by plaintiff's disputed misappropriation of documents). Indeed, the record is devoid of evidence definitively demonstrating that employees similarly situated to Plaintiff are routinely fired for comparable performance deficiencies or that Plaintiff's conduct contravened a rule customarily leading to immediate termination. *See, e.g., Nichik v. New York City Transit Auth.,* 10 Civ. 5260, 2013 WL 142372, at *6–7 (E.D.N.Y. Jan. 11, 2013) (denying summary judgment on whistleblower claim brought under National Transit Systems Security Act because, *inter alia,* evidence indicating that other

managerial employees would not have been disciplined for conduct similar to plaintiff's conduct); *Sequeira v. KB Home,* 716 F.Supp.2d 539, 556 (S.D.Tex.2009) (concluding that evidence of plaintiff's poor work performance, including negative assessments of his communication style and failure to follow chain of command structure, was insufficient, standing alone, to demonstrate plaintiff was clearly and convincingly discharged for reasons besides his protected activity under the Sarbanes–Oxley Act).

The Court, therefore, concludes that there is a genuine issue of material fact as to whether the record clearly and convincingly shows that Plaintiff would have been fired absent a retaliatory motive. Accordingly, summary judgment on Plaintiff's Section 806 claim is DENIED.

### III. *Breach of Contract*

■ "Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing Inc.,* 837 F.Supp.2d 162, 188–89 (S.D.N.Y.2011) (quoting *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir.1996)).

■ Defendants argue that summary judgment should be granted on Plaintiff's breach of contract claim because: (1) Plaintiff was an at-will employee who did not enter into a formal employ-

---

contention that Plaintiff's protected activity was unrelated to his termination, for it would be irrational to permit Plaintiff to continue participating in Rat Pack discussions if his objection precipitated the need to fire him. In addition, Plaintiff's claim that the haste of his discharge was in response to Carragher receiving confirmation in June that the unit cap would stand is inconsistent with evidence

that Carragher was confident that the unit cap would be imposed in May, which Plaintiff argued led Carragher to reignite the shell company scheme idea during the May 11th Rat Pack discussion. Indeed, Carragher's e-mail indicating that Rat Pack files should not be sent to Plaintiff may be explained by Kyprianou's decision to fire Plaintiff.

ment agreement with Defendants; (2) the terms of Plaintiff's offer letter outlining the terms for bonus compensation afford Defendants complete discretion in deciding whether to provide a bonus; and (3) Plaintiff has not demonstrated that he adequately performed under the contract or that contingencies precedent for bonus compensation were met. Def. Mem. 48–51. Defendants' first two arguments rehash those made at the motion to dismiss stage, and the Court concurs with the reasoning in the Honorable Leonard B. Sand's opinion. *See Ashmore v. CGI Grp. Inc.*, 11 Civ. 8611, 2012 WL 2148899, at *8–9 (S.D.N.Y. June 12, 2012).[22]

 Plaintiff alleges that Defendants breached the terms of his offer letter by failing to provide him with bonus compensation in accordance with the provisions of CGI's profit participation program.[23] Compl. ¶ 60. "It is well established under New York law that 'an employee's entitlement to a bonus is gov-erned by the terms of the employer's bonus plan.'" *O'Dell v. Trans World Ent. Corp.*, 153 F.Supp.2d 378, 397 (S.D.N.Y. 2001) (quoting *Hall v. United Parcel Serv. of Am., Inc.*, 76 N.Y.2d 27, 36, 556 N.Y.S.2d 21, 555 N.E.2d 273, 279 (1990) (brackets omitted)). Thus, "entitlement to a bonus only exists where the terms of the relevant contract require it." *Vetromile v. JPI Partners, LLC*, 706 F.Supp.2d 442, 448 (S.D.N.Y.2010). Although the offer letter references CGI's profit participation program, it describes the program in general terms. The letter states that profit participation is based on "measures tied to performance" and that the "program is dependent upon the success of the company, your business and your own performance" but neither clause defines standards for gauging these criteria nor provides a methodology for establishing the bonus amount.[24] Carragher Decl. Ex. 1, at 2.

---

22. Indeed, although an at-will employee may not maintain a breach of contract claim predicated solely on the fact he was fired, *see Geldzahler v. New York Med. Coll.*, 663 F.Supp.2d 379, 388 (S.D.N.Y.2009) (collecting cases), an employee "may enforce an agreement to pay an annual bonus made at the onset of the employment relationship [if] such bonus constitutes an integral part of [the] compensation package," *Thomson v. Saatchi & Saatchi Holdings (USA), Inc.*, 958 F.Supp. 808, 824–25 (W.D.N.Y.1997) (quoting *Mirchel v. RMJ Sec. Corp.*, 205 A.D.2d 388, 390, 613 N.Y.S.2d 876 (N.Y.App. Div. 1st Dep't 1994) (internal quotation marks omitted)), *aff'd*, 159 F.3d 1348, 1998 WL 439424 (2d Cir.1998) (summary order). In addition, even though "an employee cannot recover for an employer's failure to pay a bonus under a plan that provides the employer with absolute discretion in deciding whether to pay the bonus," the retention of discretion must be stated unambiguously. *Smith v. Railworks Corp.*, 10 Civ. 3980, 2011 WL 2016293, at *3 (S.D.N.Y. May 17, 2011). The operative terms for bonus compensation at issue here "contain[] none of the 'magic words' that courts generally require before concluding that the employer's discretion was unambiguous." *Ashmore*, 2012 WL 2148899, at *9 (citation omitted).

23. The letter, which was electronically signed by Plaintiff and Carragher, provides in pertinent part, "Profit Participation Program: You will be eligible to be a participant in the CGI Profit Participation Program. Through this program, you can earn an annual bonus based on the achievement of certain financial results, client satisfaction, member satisfaction and other measures tied to your performance. This program is dependent upon the success of the company, your business and your own performance." Carragher Decl. Ex. 1, at 2.

24. Plaintiff testified that when he was hired Carragher informed him that if "[he] met all [his] performance metrics, [he] would get a bonus equal to [his] base." Ashmore Dep. 385:3–14. The offer letter, however, does not mention a minimum guaranteed bonus and conditions the bonus on, among other things, "the success of the company." Carragher Decl. Ex. 1, at 2.

Furthermore, although an employee "can earn an annual bonus," the letter does not indicate when an employee becomes entitled to the bonus, whether the "annual" year is calculated from the moment an employee is hired or, instead, based on the calendar year or CGI's fiscal year, or whether an employee is entitled to an annual bonus if fired prior to the end of the year. *Id.*

Despite the offer letter's lack of detail, the evidence indicates that the program allowed for distribution of profit participation to employees who: (1) worked for CGI and the particular business unit for at least ninety days in the applicable fiscal year; (2) were not on a separate incentive or commission plan; and (3) whose performance for the past period at least met expectations. Carragher Decl. Ex. 15, at 2, ECF No. 117–15; *see, e.g., Raedle v. Credit Agricole Indosuez,* 04 Civ. 2235, 2008 WL 4279518, at *6 (S.D.N.Y. Sept. 18, 2008) ("If a contract is not integrated, evidence can be admitted of additional contract terms so long as such terms do not contradict the written terms."). In addition, it was customary in Carragher's group to limit profit participation to only those employees who were at CGI for at least six months during the applicable fiscal year. Carragher Decl. Ex. 15, at 1 (e-mail dated December 14, 2009 from Carragher to Ashmore among others explaining profit participation practices in Carragher's group); Pl. 56.1 ¶ 157. As Plaintiff commenced employment with CGI in May 2009, he was not entitled to profit participation for the fiscal year that ended on September 30, 2009.

Although Plaintiff was employed for more than six months during fiscal year 2010 and was given a "meets expectations" rating in his 2010 performance review, evidence indicates that an employee needed to be employed at CGI until at least the end of the fiscal year to be considered eligible for profit participation in that year. *See* Herbst Decl. Ex. 66, at 1 (e-mail concerning fiscal year 2009 profit participation allocations with attached planning document that included only employees within Carragher's group as of September 30, 2009). Because Plaintiff was fired before the end of fiscal year 2010, he was not entitled to bonus compensation for that year. Plaintiff adduces no evidence demonstrating that the terms of the profit participation program, as set forth in the offer letter, required that he receive a bonus.[25] Therefore, the Court concludes that there is no genuine dispute of material fact as to whether Defendants' failure to pay a bonus to Plaintiff breached the terms of Plaintiff's offer letter or the profit participation program. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 158 (2d Cir. 2000) ("A court may ... grant summary judgment ... if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language.").

Accordingly, summary judgment on Plaintiff's breach of contract claim is GRANTED.

## IV. *Motion to Remove Confidentiality Designation*

Plaintiff also moves for an order removing the confidentiality designation from

---

**25.** Plaintiff references internal billing information in an effort to demonstrate that he was entitled to a bonus equal to his base salary. *See* Pl. Mem. 58. However, Plaintiff does not explain what, if any, relationship exists between internal billing rates and bonus compensation.

certain documents submitted to the Court in connection with Defendants' motion for summary judgment. ECF No. 127. Defendants produced these documents pursuant to a limited protective order, ECF No. 43, and oppose inclusion of the documents in the record in unredacted form. By order dated March 3, 2015, the Court directed Plaintiff to file the documents in redacted form pending resolution of the motion. ECF No. 129.

## A. Legal Standard

 Protective orders issued pursuant to Federal Rule of Civil Procedure 26 serve "the vital function ... of 'secur[ing] the just, speedy, and inexpensive determination' of civil disputes ... by encouraging full disclosure of all evidence that might conceivably be relevant." *Martindell v. Int'l Tel. and Tel. Corp.*, 594 F.2d 291, 295 (2d Cir.1979) (internal citations omitted). Indeed, it is "presumptively unfair for courts to modify protective orders which assure confidentiality and upon which ... parties have reasonably relied." *AT & T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir.2005) (internal quotation marks and citation omitted). Nonetheless, when protected discovery materials are used in court filings, the common law right of the public "to inspect and copy ... judicial records and documents" is implicated, giving rise to a presumption of access. *Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). This presumptive right of access attaches to "judicial documents," which are those "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v.*

*Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir.2006) (internal quotation marks and citation omitted). If the right of access applies, the court must determine the weight to be accorded to the right and then balance the right against countervailing factors, including but not limited to, "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." *Id.* at 120 (internal quotation marks and citation omitted). The common law right of access is complemented by a "qualified First Amendment right to attend judicial proceedings and ... access certain judicial documents." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir.2004). In situations when a qualified First Amendment right applies, access may be withheld only "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (internal quotation marks and citation omitted).

## B. Application

Defendants seek to keep redacted portions of various documents describing organizational structure, staffing models, budgets, and pricing between CGI and PHAs for bids made following Plaintiff's termination.[26] Def. Letter Dated Feb. 24, 2015. Defendants contend that competitors could potentially use this information to structure opposing bids during the continuing rebid process. *Id.*

 As an initial matter, although produced pursuant to a protective order, these

---

**26.** Specifically, the documents are: (1) staffing matrices that outline the contemplated staffing structure for potential contracts; (2) HUD bid certifications that outline intended staffing for certain jurisdictions and indicate the basic administrative fee percentage for particular jurisdictions; (3) space needs docu-

ments that also show intended staffing contemplated for particular contracts; and (4) various revenue and staffing documents that indicate anticipated revenues, contribution margins, cost margins, fees, and profit percentages for potential proposals.

documents are not entitled to a presumption against access. *See Nycomed US, Inc. v. Glenmark Generics, Inc.,* 08 Civ. 5023, 2010 WL 889799, at *4 n. 6 (E.D.N.Y. Mar. 08, 2010) ("As the stipulated protective order in this case explicitly provides that parties may challenge any confidentiality designation ... any reliance on that [s]tipulation 'is insufficient to outweigh the strong presumption in favor of public access.'" (citation omitted)); *Schiller v. City of New York,* 04 Civ. 7922, 2007 WL 136149, at *3 (S.D.N.Y. Jan. 19, 2007) ("Where a protective order permits parties to designate discovery materials as '[c]onfidential' without a showing of good cause, and one party challenges a designation made by another, the challenging party is not seeking to modify the protective order and therefore does not bear the burden of demonstrating that the confidentiality designations should be lifted.").

The Second Circuit has held that "documents submitted to a court for its consideration in a summary judgment motion are—as a matter of law—judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Lugosch,* 435 F.3d at 121. With respect to the weight to be accorded such submissions, the Second Circuit made clear that "documents used by parties moving for, or opposing, summary judgment should not remain under seal *absent the most compelling reasons.*" *Id.* at 123 (internal quotation marks and citation omitted). Because the heightened First Amendment standard applies, non-disclosure "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Id.* at 124.

■ Defendants have not met this burden. Although "courts may deny access to records that are 'sources of business information that might harm a litigant's competitive standing,'" the party seeking non-disclosure "must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *In re Parmalat Sec. Litig.,* 258 F.R.D. 236, 244 (S.D.N.Y.2009) (quoting *Nixon,* 435 U.S. at 598, 98 S.Ct. 1306). Although Defendants contend that CGI's competitors might use this information to structure opposing bids, Defendants do not assert that the figures, projections, and budgets utilized to make these cancelled bids would be the same for their subsequent bids, which tends to undermine the value of the information for a competitor. Furthermore, much of the information that Defendants seek to redact has already been publically disclosed and could be gleaned from Freedom of Information Act requests to HUD and state agencies to which the information was submitted. Defendants' assertion of vague potential harm is insufficient to outweigh the strong presumption of access to these documents.

Therefore, Plaintiff's request to remove the confidentiality designation from the documents submitted in connection with the motion for summary judgment is GRANTED.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's breach of contract claim and DENIED with respect to Plaintiff's Section 806 claim. Plaintiff's motion to remove the confidentiality designation from documents submitted in opposition to Defendants' summary judgment motion is GRANTED.

352

By **October 12, 2015,** Plaintiff shall file unredacted versions of all materials filed in opposition to the motion for summary judgment and the parties shall file all letters and supporting materials concerning the confidentiality dispute that were previously submitted to the Court. The Clerk of Court is directed to terminate the motions at ECF Nos. 113 and 127.

SO ORDERED.

